DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Charles E. Weatherford, appeals the decision of the Summit County Court of Common Pleas, which denied his motion for acquittal after finding him guilty of aggravated murder, aggravated burglary, kidnapping, aggravated robbery and aggravated arson. We affirm.
 {¶ 2} Defendant was indicted on September 22, 2003, on the following five charges: one count of Aggravated Murder with Specifications in violation of R.C. 2903.01(B), a special felony; one count of Rape in violation of R.C. 2907.02, a felony in the first degree; one count of Aggravated Burglary in violation of R.C. 2911.11(A)(1), a felony in the first degree; one count of Kidnapping in violation of R.C.2905.01(A)(3)(4), a felony in the first degree; one count of Aggravated Robbery in violation of R.C. 2911.01(A)(3), a felony in the first degree; and one count of Aggravated Arson in violation of R.C.2909.02(A)(1), a felony in the first degree. Defendant entered a plea of not guilty to all charges and the case proceeded to a jury trial on March 29, 2004.
 {¶ 3} On April 15, 2004, Defendant was found not guilty of the charge of rape and not guilty of the rape specification attached to the charge of aggravated murder. The jury found Defendant guilty of the remaining charges. A mitigation hearing was held on April 29, 2004, where the jury found the aggravated circumstances proven did not outweigh the mitigating factors set forth in the charge of aggravated murder. The jury recommended a term of life imprisonment without parole.
 {¶ 4} Defendant was sentenced to life imprisonment without parole on May 4, 2004. The trial court also sentenced Defendant to five years incarceration for punishment for the crime of Kidnapping, five years punishment for the crime of Aggravated Robbery and five years punishment for the crime of Aggravated Arson. The court ordered that all of Defendant's sentences were to be served consecutively to each other.
 {¶ 5} Defendant appealed, asserting three assignments of error for our review. For ease of discussion, we will address the second and third assignments of error together.
 ASSIGNMENT OF ERROR I
"The convictions of the [Defendant] for the charges of aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson in this case are against the manifest weight of the evidence and should be reversed."
 {¶ 6} In his first assignment of error, Defendant asserts that his conviction was against the manifest weight of the evidence. He claims the relevant evidence against him does not support the convictions for aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson. We disagree.
 {¶ 7} When a defendant maintains that his conviction is against the manifest weight of the evidence,
"[A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier or fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 8} This court may only invoke the power to reverse based on manifest weight in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id. Absent extreme circumstances, an appellate court will not second-guess determinations of weight and credibility. Sykes Constr. Co. v. Martell
(Jan. 8, 1992), 9th Dist. Nos. 15034 and 15038, at 5-6.
 {¶ 9} Upon a careful review of the record, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it found Defendant guilty of aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson. See Otten, 33 Ohio App.3d at 340.
 {¶ 10} To facilitate analysis, Defendant's crimes are defined as the following:
Aggravated murder, under R.C. 2903.01(B): "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping, rape, aggravated arson, arson, aggravated robbery * * *."
Aggravated burglary, under R.C. 2911.11(A)(1): "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
the offender inflicts, or attempts to inflict physical harm on another[.]"
Kidnapping, under R.C. 2905.01(A)(3) and (A)(4): "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
(3) To terrorize, or to inflict serious physical harm on the victim or another;
(4) To engage in sexual activity, as defined in [R.C.] 2907.01, with the victim against the victim's will[.]" Aggravated robbery, under R.C.2911.01(A)(3): "No person, in attempting or committing a theft offense * * * shall * * * [i]nflict, or attempt to inflict, serious physical harm on another."
Aggravated arson, under R.C. 2902.02(A): "No person, by means of fire or explosion, shall knowingly do any of the following:
(1) Create a substantial risk of serious physical harm to any person other than the offender;
(2) Cause physical harm to any occupied structure[.]"
 {¶ 11} Defendant resided at 1050 Merton Avenue and knew Sharon Litchfield ("Litchfield"), who lived at 1062 Merton Avenue. Defendant had been attempting to establish a relationship with Litchfield prior to Litchfield's death on July 16, 2003. Defendant had sent Litchfield a sexually explicit letter, which Litchfield showed to her adult daughter, Jamie, on the evening of July 15. Litchfield told her daughter that she was going to hide the letter in case Defendant ever broke into her house. During her correspondence with Richard Rowlette, a former neighbor and a close friend now living in Florida, Litchfield had told him that Defendant had made it a habit to come by her house every night to talk to her, which made her uncomfortable and fearful. Bonnie McAtee, Litchfield's sister, also testified that Litchfield was afraid of Defendant and that whenever Litchfield was outside or into her yard, Defendant "was always around making comments" to her. McAtee also testified that her sister had received other letters from Defendant, and that Litchfield felt "threatened" by them.
 {¶ 12} On the evening of July 15, 2003, the night prior to the fire and Litchfield's death, Defendant spent approximately three hours talking to another Merton Avenue neighbor, Rose Velickovic and her son, Dan. Both individuals testified they observed Defendant's hyperactive demeanor and intoxication, and stated Defendant had a knife in his possession while talking to them. At this time, Defendant also told Dan that Sharon Litchfield was his girlfriend, even though he was currently married, and Defendant said that their relationship was of a sexual nature. Defendant left the Velickovic residence at approximately 1:30 a.m. on July 16, 2003.
 {¶ 13} Defendant's whereabouts from 1:30 a.m. to approximately 4:00 a.m. are unknown, according to trial testimony. Defendant left the Velickovic residence around 1:30 a.m. and went home, where he woke up his wife and told her that he needed her to drive him to Waste Management in Cleveland to obtain a job application. Defendant's wife testified he had not mentioned a job with Waste Management prior to the morning of July 16, but she set her alarm for 4:00 a.m. to get up and drive him there because he had lost his license. She stated she was unaware of Defendant's whereabouts prior to his coming home at 1:30 a.m., and also did not know where he was from approximately 2:00 a.m. until 4:00 a.m.
 {¶ 14} An employee of Waste Management arrived to work at approximately 5:20 a.m. and saw Defendant and his wife in their car, already in the parking lot. Defendant's car approached her and he got out of the driver's side to talk to her. Defendant told her he wanted to fill out a job application, and she replied that he would have to come back after the office had opened at 8:00 a.m. Defendant handed the employee a half sheet of paper with his name and other personal information on it, and asked her to take it. Defendant and his wife returned home shortly before 6:00 a.m.
 {¶ 15} At 6:52 a.m., Defendant is seen inside a neighborhood convenience store on the store's video surveillance tape. The manager of the store was the only employee working at the time, and recognized Defendant because he was a regular customer. She described his behavior as "pacing," "antsy" and testified that he did not stand in line to pay for his items, but "was bobbing around on the side." When Defendant did pay for his items, he paid with eight fifty-cent pieces. Jamie Litchfield testified that her mother collected fifty-cent pieces and kept them in her jewelry box. Defendant was in the store for two minutes, according to the video surveillance tape.
 {¶ 16} On July 16, 2003, the Akron Fire Department responded to a 7:02 a.m. call regarding a house fire at Litchfield's home, 1062 Merton Avenue. The arson investigator who testified at trial placed the time of the fire between 6:40 a.m. and 6:50 a.m. The fire was started in the bathroom using an accelerant, according to witnesses from Akron Fire Department and the Ohio Fire Marshall Forensic Lab. Several cans of different sizes containing gasoline were found in Litchfield's house and yard, including a Busch beer can with gasoline and a paper towel wick inside. A plastic isopropyl alcohol bottle, with alcohol inside, was found in the living room.
 {¶ 17} Donald J. Frost, a detective with the Akron Police Department's Crime Scene Unit, testified that processing a crime scene begins by documenting the scene with photographs and video. The video taken of the interior of Litchfield's home after the fire was shown to the jury. The video showed numerous items in Litchfield's home, such as her cordless phone, knick-knacks, clothing and various other items that were in closets or on shelves strewn on the floor, with many of the collectibles and her cordless phone broken in pieces. The kitchen had blood stains underneath a chair in front of the cabinets and drawers, as well as the sink, and the blinds were knocked off the window. A rolling pin, normally kept up on the victim's counter, was broken in pieces on her kitchen table and contained a blood smear. In Litchfield's bedroom, blood stains and statue fragments from a figurine normally kept on a bookshelf in her hallway were on the bed.
 {¶ 18} Bradley Robson, a lieutenant with Akron Fire Department, testified that when he entered Litchfield's bedroom during the fire, he found her body on the bed with her hands and ankles taped. Dresser drawers had been pulled out and were on top of her body. Lieutenant Robson stated that in addition to Litchfield's hands and ankles being taped, her nightgown was on inside out and was "hiked all up on the one side, hiked above her hip at that point," and that she was nude underneath. When firefighters carried Litchfield outside, Lieutenant Robson stated that she had stains on her face that he initially thought were from smoke inhalation, but, upon examination, turned out to be blood.
 {¶ 19} Upon examination by the Summit County Medical Examiner, it was determined that she had suffered multiple head wounds, brain hemorrhaging, facial fractures and injuries consistent with manual strangulation. Litchfield also had defensive wounds on her hands and blunt force injuries to the rest of her body. During her testimony regarding the autopsy findings, the medical examiner also stated that the absence of soot in Litchfield's lungs led to the conclusion that she had died prior to the fire's inception. The medical examiner determined the time of death to be between 12:00 a.m. and 6:00 a.m. on July 16, 2003. Litchfield's cause of death was found to be blunt force trauma to the head, with a contributing cause of strangulation.
 {¶ 20} James and Holly Kirn, residents of Bertha Avenue, one block behind Merton Avenue, noticed smoke coming from the direction of Merton Avenue and called the Akron Fire Department. They went to the source of the fire after calling 911, and Mr. Kirn attempted to enter Litchfield's home through the side door, but could not proceed into the house because of the flames. When Mr. Kirn came out of the house, Defendant was there saying, "Sheri's in there. Sheri's in there. We got to get her out." Mr. Kirn testified that Defendant's hair looked wet and that he "smelled fresh," as if he had just gotten out of the shower. Mr. Kirn stated that although he did not know Defendant personally, he recognized him from seeing him in the neighborhood. Mr. Kirn and Defendant went around the back of Litchfield's house to get the garden hose, but when Mr. Kirn went to the front of the house to turn it on, Defendant had disappeared.
 {¶ 21} Michael Blumer ("Blumer"), a Merton Avenue neighbor, testified that Defendant entered his home at between 7:30 a.m. and 7:45 a.m. on the morning of July 16, 2003. Blumer testified he was still sleeping when Defendant entered his bedroom unannounced, at which point he awoke and "lost [his] temper" at Defendant because Defendant had a habit of coming into Blumer's house while Blumer was sleeping. Blumer stated he got Defendant to the door, and Defendant offered him $20.00 if Blumer would let him stay there for 15 minutes. Blumer agreed because Defendant owed him $40.00. Blumer testified that Defendant was pacing, looking out the windows and saying, "This is crazy." When Blumer asked him what he meant, Defendant said that a woman up the street had been burned in her house. Blumer stated Defendant was "hyper" while he was at his house, and that he stayed for over an hour, which made Blumer nervous.
 {¶ 22} When Blumer told Defendant that he had to leave, Defendant asked him to take him to a friend's house on another street. Defendant sat in the backseat of Blumer's car, where he "scooted down so no one could see him," according to Blumer. Blumer said that the Akron police had blocked off the street and police cars were driving up and down Merton Avenue. Defendant stayed hidden from view the whole time he was in Blumer's car, until they came to where Blumer was to drop Defendant off. At this point, Defendant tried to open the car door, but because of the child safety features, the back passenger doors could only be opened from the outside and the windows only be rolled halfway down. When Defendant could not get the door open, he told Blumer, "Oh my God, I can't get out the back door. You got to get me out before a cop comes by." Blumer told him to wait a minute, that he would come around and open the door, but Defendant "squeezed [him]self through my window that was half rolled down, squeezed [him]self out, fell out backwards and [ran] into the house."
 {¶ 23} Ransom Moffit ("Moffit") lives in the general area of Merton Avenue and has known Defendant for many years, as Defendant and Moffit's children went to school together. Moffit testified that Defendant came to his house on July 16, 2003, around 12:00 p.m. and described Defendant as acting "nervous [and] disturbed." Moffit stated that Defendant had told him, "They're looking for me. They're going to blame this on me. I didn't do it." After Defendant had been there for approximately one hour, Moffit became "uncomfortable" when Defendant asked, "Do you think I done it?" and "What would you do if I done it?" Moffit then left the house and summoned a nearby detective, where he informed the detective of Defendant's whereabouts.
 {¶ 24} Sometime after 1:00 p.m., Defendant called the Akron Police Department and was subsequently transferred to the cellular phone of Detective David Whiddon, who was at the scene of the fire. Defendant identified himself, according to Detective Whiddon, who stated that Defendant "said that he knew we were looking for him" and was "talking very fast." Defendant also told Detective Whiddon that he was afraid he would have to go to jail because of an outstanding warrant, and that he did not want to be in jail during the birth of his child. Defendant said to Detective Whiddon, "[J]ust because [I] was at the victim's house when it was on fire does not mean [I] killed her." Defendant was arrested at Ransom Moffit's house. During a search of Defendant's home following his arrest, police located a purple towel with blood on it. Forensic lab analysis showed the towel contained Defendant's and Sharon Litchfield's DNA standard.
 {¶ 25} Bobby Kennedy ("Kennedy"), a State's witness, has known Defendant since 1995 and the two individuals were in neighboring cells in Summit County Jail during the fall of 2003. Kennedy testified that Defendant started talking to him about Litchfield's death, and he told Kennedy that he was worried about items he stole from Litchfield's house:
"He was worried about some change he stole from the house, some jewelry and prescription medication. * * * He said that he broke in the back of the house. He got — was talking to her in the back of the house. He ended up — he lost his temper. He was up for days, strung out on dope. He struck her, he hit her, and then he ended up killing her."
 {¶ 26} According to Kennedy's testimony, Defendant went to Litchfield's bathroom after he assaulted her to steal prescription medication and then went looking for other items to steal. Defendant then left Litchfield's house, but returned to set the house on fire. Defendant told Kennedy that he started the fire in the bathroom because "he was touching stuff in the bathroom." After the fire started, Defendant told Kennedy that he went to a service station "so he could get put on the camera spending money at the gas station." Defendant said that he had changed his clothes, threw them away and washed his hands. Defendant also spoke to Kennedy about his relationship with Litchfield:
"He told me that he was trying to have a relationship with her and that she wasn't for it. * * * He was worried about the letter he wrote her [.] He said that he was trying to have a relationship with her but she wasn't wanting. * * * He got in an argument with her in the kitchen. He struck her; she fell down. He ended up hitting her in the head with something else, killing her. * * * He said that before he left, he wiped the house down. And he came back later and set the house on fire."
During his testimony, Kennedy stated that Defendant had told him that an older woman had molested him when he was 13, and "since then he's had a thing for older women." At the time of Litchfield's death, Defendant was 36 years old and Litchfield was 59 years old.
 {¶ 27} Defendant argues that his "detailed alibi defense" was supported by several independent witnesses, that there was no evidence that he had threatened Litchfield, and that there was a lack of physical evidence linking him to the crime. The jury in this case had the opportunity to view the witnesses' testimony and judge their credibility. In a jury trial, matters of credibility of witnesses are primarily for the trier of fact, therefore, we must give deference to the jurors' judgment. See State v. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118, at 13; State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. We will not overturn the verdict on a manifest weight challenge simply because the jury chose to believe the evidence offered by the prosecution. State v. Merryman, 9th Dist. No. 02CA008109, 2003-Ohio-4528, at ¶ 28. See, also, State v. Warren (1995),106 Ohio App.3d 753, 760. The totality of the evidence presented, including the DNA evidence found on the towel in Defendant's home, persuades us that the jury neither lost its way nor created a manifest miscarriage of justice in convicting Defendant of aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson. Accordingly, Defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"The trial court incorrectly denied [Defendant's] motion for acquittal in violation of Criminal Rule 29; specifically, there was not sufficient evidence to prove the offenses of aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson beyond a reasonable doubt."
 ASSIGNMENT OF ERROR III
"The trial court erred to the prejudice of [Defendant] and in violation of Criminal Rule 29(A), Article 1, Section 10 of the Ohio Constitution and Fourteenth Amendment to the [U.S. Constitution], when it denied [Defendant's] motion for acquittal."
 {¶ 28} In his second and third assignments of error, Defendant requests that this Court examine whether there was sufficient evidence to convict him on the above-mentioned charges. Specifically, Defendant claims that the conviction was procured without physical evidence linking him to any of the crimes of which he was convicted, and that the trial court erred when it denied the Crim.R. 29 motion. We find these arguments to be without merit.
 {¶ 29} As an initial matter, this court notes that the sufficiency and manifest weight of the evidence are legally distinct issues. State v.Manges, 9th Dist. No. 01CA007850, 2002-Ohio-3193, at ¶ 23, citing Statev. Thompkins (1997), 78 Ohio St.3d 380, 386. Sufficiency tests whether the prosecution has met its initial burden of production at trial, whereas a manifest weight challenge questions whether the production has met its burden of persuasion. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3.
 {¶ 30} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal under Crim.R. 29(A) if, after "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) Jackson v. Virginia (1979), 443 U.S. 307, 319,61 L.Ed.2d 560. In making this determination, all evidence must be construed in a light most favorable to the prosecution. State v. Wolfe
(1988), 51 Ohio App.3d 215, 216.
 {¶ 31} In resolving Appellant's first assignment of error, we concluded that his convictions for aggravated murder with specifications, aggravated burglary, kidnapping, aggravated robbery, and aggravated arson were not against the manifest weight of the evidence. Based on our previous finding that "a determination that [a] conviction is supported by the weight of the evidence [is] dispositive of the issue of sufficiency," we find that any issues regarding the sufficiency of the evidence must be similarly disposed of. See State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. This Court concludes that the there was sufficient evidence to allow the trial court to conclude that each material element of the charges against Defendant had been satisfied, thereby precluding the trial court from granting his Crim.R. 29(A) motion. Thus, we overrule Defendant's second and third assignments of error.
 {¶ 32} Defendant's three assignments of error are overruled, and we affirm the judgment of the Summit County Court of Common Pleas.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, P.J. Carr, J. concurs.
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.)