[Cite as *State v. McGowan*, 2019-Ohio-5319.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-467 |
| v. | : | (C.P.C. No. 17CR-1919) |
| Andrew M. McGowan, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 24, 2019

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Kimberly M. Bond,* for appellee.

**On brief:** *The Law Office of Thomas F. Hayes, LLC,* and *Thomas F. Hayes,* for appellant. **Argued:** *Thomas F. Hayes.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} Andrew McGowan "does not challenge in this appeal" that he "disposed of Gabby [Hinojosa's] body," which was recovered from the Big Darby Creek in a City of Columbus recycling bin with holes drilled into it and further weighted down by a car battery. *See* Reply Brief at 1. After all, there was evidence that the bin and the battery had come from the automotive garage he operated; police found plastic curlicues there that reasonably could be thought consistent with material from the drill holes; and arguably corresponding plastic particles also were discovered in a conversion van that he had there. *Compare* Appellant's Brief at 6 ("The non-medical forensic evidence implicates Andy * * * in disposing of Gabby's body") (bolding omitted). But he contends that the jury reached too far in concluding that he also killed Ms. Hinojosa, who was the mother of his child and who according to testimony had been in his car shortly before she vanished. The witness

who testified to his confession was not credible, he submits, and he argues that the sum of the evidence did not establish beyond a reasonable doubt that Ms. Hinojosa died at his hands or other than accidentally. We affirm his conviction for aggravated murder, determining that the jury's verdict was not contrary to the manifest weight of the evidence.

{¶ 2} We summarize some of the evidence below. A capsule synopsis is that the jury heard testimony from which it reasonably could have concluded that Mr. McGowan, who in addition to running his car lot/garage "was also a heroin dealer," Appellant's Brief at 3, was involved in abducting and abusing his former girlfriend, and in placing such force on the right side of her neck that she died before her bruised and scraped body, with her head recently and weirdly partially shaven, was placed into the recycling bin, had bleach poured over it, and was dumped into the Big Darby. The body, once recovered, evidenced "therapeutic" levels of Fentanyl that the state's expert said would have rendered her lethargic but that the defense experts said could have killed her. There was evidence that on the day Ms. Hinojosa was reported missing, Mr. McGowan excused his heroin-retained employee from the garage for substantial periods, that within days Mr. McGowan took the unprecedented step of ordering that the garage be scrubbed out with bleach, and that he later sought to elude police after a warrant had issued for his arrest. And yes, Mr. McGowan's long-time employee did testify that Mr. McGowan confessed to killing Ms. Hinojosa.

{¶ 3} Mr. McGowan, of course, had no burden of proof at all, and the relevant question for the jury was whether the state proved his guilt beyond a reasonable doubt with regard to the charge of aggravated murder. But by way of argument, he does posit to us two alternative scenarios to bear in mind during a review of the evidence. Although the evidence of his "purported confession" is "too dubious to sustain a homicide conviction," Mr. McGowan argues, "[t]here is a more plausible explanation for Gabby's death: that she allowed another man to strangle her as part of prostituting herself." Appellant's Brief at 19. On the other hand, he urges, "[t]he evidence does not prove beyond a reasonable doubt that Gabby was killed by anyone," and the evidence does not prove "homicide by strangulation" but may suggest an "accidental overdose" of Fentanyl. *Id.* (bolding omitted); *id.* at 25.

{¶ 4} But these alternative hypotheses don't do much to illustrate Mr. McGowan's contention regarding the manifest weight of the evidence. We note first that his concession that "[t]here is legally sufficient evidence which if believed would prove that [he] disposed

of Gabby's body after she died," *id.* at 13, acknowledges evidence that might not be thought entirely consistent with a theory that Ms. Hinojosa perished in the clutches of some sadistic third party (or with testimony that Mr. McGowan had claimed that he last saw Ms. Hinojosa after dropping her off in the Hilltop area). Nor does the theory of an unrelated third-party culprit necessarily square with evidence that Mr. McGowan attempted to evade police (or of course with the testimony that he confessed to killing Ms. Hinojosa).

{¶ 5} By the same token, the jury reasonably could have accepted the deputy coroner's testimony that Ms. Hinojosa's death resulted from "undetermined homicidal violence" as substantiated by neck and torso compression and by other injuries that the deputy coroner (in contrast with defense experts) testified the victim suffered before her death. It would not have been out of bounds, either, for the jury to find that evidence that Ms. Hinojosa's head had been shaven before her death (in a pattern that left a large tuft at the top of her head and hair at the sides below a wide circle) was consistent with contemporaneous violence, and that evidence that the recycling bin/casket reeked of bleach was also consistent with other evidence pointing to homicide as alleged rather than to an accidental drug overdose. The testimony that Mr. McGowan confessed to having killed Ms. Hinojosa was not the only evidence, therefore, from which the jury could have concluded that she died a violent death.

{¶ 6} None of that is to say that the jury could not have credited the testimony of J.B., an employee and avowed heroin client of Mr. McGowan's, when he averred that Mr. McGowan "told me he fucked up and killed Gabby." Tr. at 923. Determining credibility is a vital jury function, and we discern nothing that should have precluded the jury from making its own evaluation of J.B.'s testimony (or of the competing views of the medical experts).

{¶ 7} The jury first heard testimony from K.H., Gabriel Hinojosa's cousin. Gabriel lived with K.H., who was seeking to provide her with a stable environment as Gabriel worked to put her drug problems behind her. Tr. at 140-41. K.H. said she consistently checked in on Gabriel and regularly tracked her through an app on Gabriel's cell phone. *Id.* at 160. She said that Gabriel was engaged in a "daily struggle to get away from her past," and although Gabriel had changed to "being sober enough to actually live her life," *id.* at 145, K.H. conceded that there were times "I was nervous that she was back on the streets," *id.* at 203.

{¶ 8} K.H. testified that she last saw Gabriel on Sunday afternoon February 19, 2017, when Gabriel got into Mr. McGowan's car and drove off with him. *Id.* at 167-68. Gabriel was "super excited," K.H. said, by her planned visit with her three-year-old daughter (whom she could see only as Mr. McGowan allowed). *Id.* at 163, 166. Then, despite her regular habits of cell phone use, Gabriel had no further communication with K.H.; she did not respond to texts, calls, or Facebook posts, which was not normal, and whereas generally "[s]he would come home every night," she did not return. *Id.* at 164, 168, 169. "I see Gabriel getting into his car [with him]. * * * And that's the last time that I seen her." *Id.* at 167.

{¶ 9} According to a report prepared by an FBI analyst, "[t]he last outbound voice call made from [Gabriel's phone] was placed at 4:24 pm [that day], February 19, 2017"; there were no outgoing texts either after that time, and by 5:00 p.m. that evening, the phone was "in the possession of a citizen" on Columbus's Warren Avenue. State's Ex. 587 at 13; Tr. at 1366. K.H.'s tracking of the phone, too, showed its location constant at Warren in the Hilltop neighborhood. Tr. at 170, 190, 195. K.H. thought it "weird" that the phone's movement had stopped, and testified that the location was "completely out of [Gabriel's] environment." *Id.* at 170, 190. Another witness, N.B., later testified that her "brother found a phone in the alley" behind the house where they lived on Warren Avenue, answered it only to tell the caller to "screw off," and later "mashed it in the back alley," *id.* at 1429-30; police recovered it at a later point, *id.* at 1252 (Det. Meister).

{¶ 10} K.H. had texted Mr. McGowan to inquire where Gabriel was, and he responded that she was no longer with him and that he had dropped her off on the Hilltop. Tr. at 182, 194. K.H. attempted, unsuccessfully at that juncture, to reclaim Gabriel's cell phone from its possessor. *Id.* at 195. The next day, she advised Mr. McGowan that she was going to file a missing person's report and tell the police "that you were the last person with her"; he told her to go ahead. *Id.* at 183, 199. After not having seen Gabriel for more than 24 hours she did report Gabriel's disappearance to the police on the evening of February 20, telling them her information about Gabriel's phone and that she'd last seen Gabriel wearing jeans, Nikes, and a white tank top under a "black zip-up jacket with pink writing on it." *Id.* at 171-73, 196-97, 212. She had never reported Gabriel missing before. *Id.* at 171. At trial, K.H. identified those jeans, now discolored by bleach, and the similarly discolored jacket

that before bleaching had been "completely black" with the Pink inscription "love pink" on the back as those that Gabriel "had walked out of my door with on." *Id.* at 175-77.

{¶ 11} K.H. also testified that Gabriel had "recently got her hair done," and that when she had left the house to get into Mr. McGowan's car, she had a full head of hair (which she was wearing "down"). *Id.* at 187-88. By the time Gabriel's body was recovered, however, wide swaths of that hair had been "shaved off": K.H. averred that Gabriel had "[n]ever" been known to do anything like that. *Id.* at 189; *see also, e.g.,* State's Exs. 99, 104, 120, 364, 375 (autopsy photographs showing head shaved all around crown, leaving a tuft in the middle and hair at the sides).

{¶ 12} Police reached out to Mr. McGowan as the only person listed by K.H. in her missing person's report. Eventually an interview was conducted in his lawyer's office on the afternoon of February 23; police viewed him as cooperative. Tr. at 538, 543, 554, 569 (Officer Grocki testimony).

{¶ 13} On an unseasonably warm February 24, four days after K.H. had reported Gabriel missing, kayakers discovered Gabriel's body in "a bright blue recycling trash can" in the Big Darby Creek. *Id.* at 234-35. The receptacle was "slightly sticking out of the water," with its lid "tied shut." *Id.* at 234-35. They "opened it a little bit and * * * saw the Nike shoes." *Id.* at 236.

{¶ 14} Ohio Bureau of Criminal Investigation crime scene investigator Todd Fortner examined the bin at the creek and at the coroner's office. *Id.* at 363-65, 375. Holes had been drilled into the side of the bin and its lid, and Agent Fortner testified that a number of wires secured the lid to the bin: a yellow wire was marked "left turn," a brown wire was marked "taillight," and another wire was marked "right turn." *Id.* at 374, 382-83. And, "in the bottom of the bin, a car battery was located." *Id.* at 406.

{¶ 15} "The victim was in the bin head down with her feet up." *Id.* at 384. "[H]er shoes [were] above the waterline with her feet," and she had "some loose hair * * * in her right hand." *Id.* at 384-86. Agent Fortner testified that he noticed "an odor of bleach-type or some chemical-type of smell" as he removed the body and other items. *Id.* at 393-94. The holes drilled into the bin had left some plastic protrusions; some holes "had little corkscrew shapes and some of them actually had spirals of plastic adhering to them." Tr. at 638 (testimony of BCI trace evidence examiner Elliot); State's Ex. 279, 281 (photographs).

{¶ 16} The forensic evidence included testimony from Dr. Kenneth Gerston, a pathologist from the Franklin County Coroner's Office who performed the autopsy on Gabriel's body the morning after it was discovered. *Id.* at 1014, 1020, 1022; State's Ex. 574 (autopsy report). He could not pinpoint the date of death because the body had been "fairly well preserved in cold water," and bodies immersed in temperatures of less than 39 degrees Fahrenheit "can be preserved for quite a long time." Tr. at 1800.

{¶ 17} Dr. Gerston testified that "the scalp was shaven in a kind of circular pattern. There were no injuries to the face itself," but there had been "bruising or bleeding into the hair follicles." *Id.* at 1026, 1035. He opined that Gabriel's scalp had been shaved either within a few days before her death ("[b]ecause there is no hair growth"), or up to only "a few minutes after her death" (because of a contusion indicating "bleeding into the skin of the scalp"). *Id.* at 1035-36. The top of the scalp had "discoloration which might indicate irritation or that the hair was pulled to some extent." *Id.* at 1034.

{¶ 18} The body revealed markings that "would have occurred either shortly before death or just at the time of death," Dr. Gerston averred. *Id.* at 1037-38. Abrasions to the back left apparent fabric patterns of the sort "you would get if you wrinkled cloth and pressed it hard against the skin. * * * * The pattern would indicate that most likely this would be applied by tightening the cloth or pulling the cloth from the front and the pressure therefore would be exerted on the back." *Id.* at 1036-37.

{¶ 19} There were recent patterned abrasions on the left forearm, and a dried abrasion on the left thigh, as well as injuries to the torso and elsewhere. *Id.* at 1028, 1034. The neck reflected a "dried brown abrasion mostly on the right side," and also a "weave abrasion * * * under the chin." *Id.* at 1027. She would not have bled from these injuries externally. *Id.* at 1044. The injury to the neck reflected that "most of the pressure was on the right side," Dr. Gerston said, and the hemorrhage extended down to the sternum. *Id.* at 1042, 1049. There was a "large amount" of blood within the tissue of the larynx. *Id.* at 1050, 1051.

{¶ 20} The injury to Gabriel's neck "would have occurred before death," Dr. Gerston opined. *Id.* at 1048. He elaborated: "[I]n order for blood to accumulate in this fashion within the tissue, there has to be blood pressure and therefore there has to be a pulse for a heartbeat." *Id.* at 1052. And it was not an accident: "It's very unusual, virtually impossible for someone to have pressure around their neck and around their torso given the weave

patterns, tightening, which would be due to tightening of cloth or clothing," where there was no history of having become entangled in a machine. *Id.* at 1059. "I believe the only way * * * these markings, these abrasions and the pressure on the torso, the pressure on the neck could have occurred would be at the hands of another person." *Id.* at 1061.

{¶ 21} A toxicology report reflected a small amount of a metabolite of cocaine, but "[c]ocaine itself was not present." *Id.* at 1054-55. Fentanyl in a "not lethal or toxic" amount of 2.6 nanograms was also found, along with indications of marijuana use from the past 30 days, and Buprenorphine, "a drug which is used to help people come off addiction" and that is an opioid antagonist that would have "lessen[ed] the [e]ffect" of Fentanyl. *Id.* at 1055-56. "I believe that the Fentanyl alone would not have caused her death," Dr. Gerston continued, "but perhaps the neck compression in combination with that did." *Id.* at 1056-57.

{¶ 22} To a reasonable degree of medical certainty, Dr. Gerston attributed the death to "undetermined homicidal violence[,] referring to the compression of the neck, the compression of the torso, which would interfere with breathing and the other significant conditions." *Id.* at 1057. "[T]here was a great deal of pressure exerted on the right side of her neck," which "would have been enough to have caused a lack of blood flow to the brain which is like strangulation * * * * It would cut off the supply of blood to the brain that is by compressing the carotid artery and it would prevent blood from returning to the heart from the brain because the jugular vein is compressed." *Id.* at 1061, 1064.

{¶ 23} The levels of drugs in her system were not enough to cause Gabriel's death, Dr. Gerston reiterated; even had they been significantly higher, he would have ruled the death a homicide. *Id.* at 1088. "[T]he pressure on the neck would occlude vessels to the brain and would cause death by brain anoxia and it would eventually stop her heart beat and her breathing, but * * * the reason why the Fentanyl is contributory is because she would be lethargic, she would be unable to resist such a thing and would explain why there are no defense wounds." *Id.* at 1097. Gabriel's level of Fentanyl, at under three nanograms per milliliter, he said, "would be considered a therapeutic dose"; in excess of seven is in the "toxic" range, while "ten and above would be considered a lethal dose." *Id.* at 1796-97.

{¶ 24} Dr. Gerston testified, contrary to defense experts, that Gabriel had incurred "[m]ost" of the abrasions on her body before she died. *Id.* at 1788. "A postmortem abrasion" of a victim put in water "would be rather [diffuse]. These abrasions were rather

well defined except on the neck." *Id.* Moreover, "when the tissue was opened and especially on the neck, there was hemorrhage into the tissues and that can only occur when the blood pressure is present which means the heart was beating which means the victim was alive at the time that those lesions occurred." *Id.* at 1788-89; 1791 ("this type of injury * * * could only have occurred while the victim was living, not after death"), 1792-93. And the absence of petechial hemorrhages that frequently but not always accompany strangulation does not undermine this view, he said, "because if the pressure [on the neck] is too great, you won't have any circulation [of blood] to the area." *Id.* at 1794.

{¶ 25} Cross-examination of Dr. Gerston elicited that he no longer conducts autopsies, and that he was demoted after having been the subject of some sort of anonymous complaints and having declined to undergo further testing following one neurological evaluation. *Id.* at 1111-14.

{¶ 26} The jury also heard from J.B., who testified that he had known Mr. McGowan for roughly five years. *Id.* at 792. They first met when J.B. purchased heroin from Mr. McGowan, a transaction that was repeated some 75 or 80 times before J.B. went to work for him. *Id.* at 800-02. Mr. McGowan employed J.B. to work on cars and around his garage, J.B. said, paying him "[e]very day" with drugs. *Id.* at 803, 806. J.B. met Mr. McGowan's "inseparable" associate M.C. under the same circumstances. *Id.* at 811, 812. There came a time, J.B. testified, when he began living in the garage rent-free, paid with drugs and meals to serve Mr. McGowan and M.C. as the garage mechanic fixing cars for resale. *Id.* at 819-22.

{¶ 27} J.B. had known Gabriel Hinojosa, he said, for as long as he had known Mr. McGowan; at one period, they had "hung out and done dope together," and he considered her "soft-hearted," generous to strangers, and "the nicest person you'd ever want to meet." *Id.* at 832-34. He hadn't seen her in the garage when he was living there, though, "up until the day that she come up missing. * * * * And I really didn't see her, but I seen the back of her head and I know it was her because I know her." *Id.* at 832. He testified that this was on February 20 (the day K.H. filed the missing person's report). *Id.* at 968. Asked whether he had seen Gabriel with Mr. McGowan, he said that on that day, "I saw a girl in the car and I know it was Gabby because I know what she looks like." *Id.*

{¶ 28} That day was very unusual, according to J.B. "[T]he date that she come up missing" (as he later learned), Mr. McGowan had "come to the garage and told me to take

the day off." *Id.* at 836.  That had never happened before, he said, and there were a lot of things to be done at the garage.  *Id.* at 837.  Mr. McGowan "just said take the day off, me and Gabriel was going to go in and have sex." *Id.* at 838.  J.B. testified that he left the garage and returned at around noon:  Mr. McGowan "come out and met me outside and he was sweating real bad and he said come back later.  * * * * He * * * said come back later[,] we're still in there." *Id.* at 838, 840.  When J.B. next returned, around 11:30 at night after having visited with a couple family members, Mr. McGowan again met him outside by the gate, he said, and dispatched him to White Castle to get some hamburgers.  *Id.* at 842, 844. Mr. McGowan was not at the garage when he got back from that errand, but "pulled back in" shortly thereafter, got his sandwich, picked up something like a Kroger's bag, and departed. *Id.* at 842-46.   J.B. noticed that the white conversion van with tinted windows that earlier that day had been parked outside had been moved into the garage.  *Id.* at 920, 922.  J.B. did not see Mr. McGowan for a couple days after that, he said, when Mr. McGowan came in, complained the garage gave him headaches, "[gave] me some dope and left." *Id.* at 847.

{¶ 29}  "[L]ike two days later," Mr. McGowan "come back with like a bunch of bleach * * * * probably at least 20" bottles, J.B. told the jury.  *Id.* at 849.  They took the bleach from the car to the garage and were joined by M.C.  Mr. McGowan "said start pouring it all over the floor," and they took brooms and scrubbed the garage.  *Id.* at 850.  J.B. testified that he had never done that before, either there or in any garage.  *Id.*; *see also id.* at 815.  They scrubbed the floor, and in certain areas the walls "about a foot up." *Id.* at 851.  When that was all done, Mr. McGowan "talked for a minute and he left," J.B. said.  *Id.*  J.B. testified that he and M.C. then talked for "[a]bout an hour," and M.C. left.  *Id.* at 852.

{¶ 30}  "[T]hree days later," J.B. said, Mr. McGowan returned to the garage to get a motor home; he left in it and that was the last J.B. saw of him until the trial.  *Id.* at 853, 857. J.B. did see a text message that M.C. received showing Mr. McGowan standing on a beach with palm trees.  *Id.* at 919.

{¶ 31} The trial transcript reflects that after some brief further questioning about events surrounding the day he had been told to take off from the garage, Mr. McGowan was asked:  "And then the next time -- or how many days later was it when you helped clean the floor?"  He answered:  "About three days later." *Id.* at 922.  After some discussion of with whom he had cleaned the floor, he was asked:

Q: Is there a point in time when everyone had left and just you and Andrew McGowan were alone?

A: Yeah.

Q: When was that?

A: The third day when he come back.

Q: Okay.  And did the two of you have any kind of conversation?

A: He told me he fucked up and killed Gabby.

*Id.* at 922-23 (concluding J.B.'s direct examination).

{¶ 32} Cross-examination returned to the testimony that Mr. McGowan had confessed to J.B.:

Q: You told the detectives in the first interview that [Mr.McGowan] told you, man, she handed me custody papers for my baby and I killed her?

A: Yes.

Q: But you didn't testify to that just now with Mr. Hughes, correct?

A: I don't recall him asking me that.

Q: I think he asked you what [Mr. McGowan] said and you said that [he] told you, I fucked up and killed Gabby?

A: Yeah.

Q: Okay. So your testimony today is different than what you told the detectives back in March, is that what you're saying?

A: No.

*Id.* at 951-52; *see also id.* at 966 (reaffirming that confession came just days after February 20, the day he had been told to take off from the garage).

{¶ 33} J.B. had adverted to such a conversation earlier in his direct testimony when he was asked how long he had continued working at the garage after Mr. McGowan had taken off in the RV.  He said that he had kept working for about two weeks, until he was told by someone that he had "better leave the garage because [Mr. McGowan] was going to

come back and kill me." *Id.* at 858. At that point, he said, he "got in [M.C.'s] car and left." *Id.* at 858, 863; *compare* 966-67 (lived in shop for two days after confession), 959-61 (received communication from Mr. McGowan and M.C. while they were in Florida and he was in the shop maybe the week after February 20). He stayed in an undisclosed location outside of Franklin County for a month or two, he said, and during that time went to the police department there to give them his account: "I just felt that he should have justice and he told me that he killed her." *Id.* at 859-61.

{¶ 34} J.B. also testified to having been asked by Mr. McGowan to clean the interior of the conversion van, twice, something he said was not normal. *Id.* at 871-72. And he identified for the jury the battery that had been found in the bin with Ms. Hinojosa's body as having come from the garage. *Id.* at 915. He identified the recycling bin, too, from paint on its side. *Id.* at 916. The wires that had held the lid to the bin shut also had come from the shop, he said: "[W]e were going to rewire that trailer that was in the pictures earlier." *Id.* at 917.

{¶ 35} On cross-examination, J.B. repeated that he had recognized Gabriel as the woman he had seen in the car on February 20, the day when Mr. McGowan "told me to take the day off." *Id.* at 968. He acknowledged that he had told police he had seen blood in the garage, *id.* at 957, and that from the time of his meeting with police on or around March 27, 2017 through the time of his testimony, they had provided him with hotels and money, *id.* at 928-33, *see also id.* at 1201, 1204 (Det. Duffer testimony). J.B. said, too, that during the times in question and before quitting drugs, he had been in the habit of shooting up with heroin multiple times a day. *Id.* at 946.

{¶ 36} After speaking with J.B. on March 27, 2017, law enforcement authorities executed a search warrant relating to the garage. *Id.* at 1236 (Det. Meister testimony). M.C., who during the search identified himself as co-owner of the garage, declined to speak further with police that evening. *Id.* at 1237. Later, he "never showed" for scheduled interviews. *Id.*

{¶ 37} Agent Fortner helped collect evidence from the garage, including "four empty bottles of Clorox bleach." *Id.* at 419, 458. He also described a "drill that was recovered from the rear seat floorboard of a Buick" at the garage, *id.* at 461-62; its drill bit was of the same diameter as the half-inch holes in the blue recycle bin, *id.* at 463. Blue "spiral shape[d]" plastic pieces were found under a vehicle. *Id.* at 465. The white conversion van found at the

garage had been recently vacuumed and a "small DustBuster-type sweeper" was found in it. *Id.* at 471, 473. Agent Fortner found a "very small piece of blue plastic" on the floor in the rear of the van. *Id.* at 474. Another piece was "found at the edge of the carpet" in the rear of the van. *Id.*; *see also* exhibits 157, 159.   Additionally, three pieces of "insulated wire" were found in the van. *Id.* at 477.

{¶ 38} Suzanne Elliot, a trace evidence examiner for BCI, testified that the holes in the bin containing the victim's body were measured "to be about a half of an inch." *Id.* at 639. Some holes "had little corkscrew shapes and some of them actually had spirals of plastic adhering to them." *Id.* at 638. The color of a sample from "[t]he body of the toter [bin] matched the questioned blue plastic" found in the white van. *Id.* at 658, 647, 660. The color also matched between a sample and "the blue plastic shavings from the floor under the vehicle." *Id.* at 660. All plastic samples tested were polyethylene and were the "same color, tint and texture." *Id.* at 693-94, 696.

{¶ 39} Ms. Elliot found that the plastic pieces recovered from the van were "the same color, tint and texture, microscopical characteristics and chemical composition as the plastic composing the [bin]" in which the victim's body had been found. *Id.* at 698. The "plastic, blue shavings from [the] floor under [the] vehicle [were] the same color, tint, texture and chemical composition and they did have [] similar microscopical characteristics as to plastic composing the toter lid." *Id.* She concluded that "based on these findings, those two questioned items of plastic could have come from this toter, but not exclusively. I cannot identify them as having come from that toter to the exclusion of all others." *Id.* at 698-99.

{¶ 40} She also testified that her examination of the drill and the bit found at Mr. McGowan's garage "[f]ailed to reveal the presence of any blue plastic materials." *Id.* at 611. And she described the hair "from [the] victim's hand" as human hairs that had been "cut" rather than pulled out because they had "no visible roots." *Id.* at 619-21.

{¶ 41} Devonie Herdeman, a forensic scientist at BCI and DNA analyst, testified that DNA from an "unknown male" was on the inside crotch of the victim's underwear, but it was "insufficient for comparison." *Id.* at 744, 746, 754. She made the same finding for DNA from swabs from the victim's fingertip and vagina, as well as DNA from the car battery. *Id.* at 755. Herdeman stated that "Andrew McGowan was excluded as a contributor to [the] mixture" from the samples in the victim's underwear. *Id.* at 757. In addition, DNA from one

of two pairs of hair clippers excluded both the victim and McGowan. *Id.* at 759. His employee and sometime garage resident J.B.'s DNA was present on the other pair of clippers. *Id.* at 761.

{¶ 42} After that search and a review of the evidence, police obtained a warrant for Mr. McGowan. *Id.* at 1240-43. Detective Bill Duffer and Detective Brian Meister from the Franklin County Sheriff's Office recounted for the jury the investigation and Mr. McGowan's eventual apprehension. Mr. McGowan had not returned telephone calls, Detective Meister testified. *Id.* at 1225. And he was not found at any of the addresses or locations where they detectives looked for him, including a house where he reportedly had lived with M.C. "less than a mile from the scene where the trash receptacle was found" in the Big Darby Creek. *Id.* at 1225, 1279-82.

{¶ 43} Detectives eventually received a tip that Mr. McGowan's then-current girlfriend "had showed up" at his mother's house in Jackson County, "driving a large motor home" with Mr. McGowan and his daughter by Gabriel in tow. *Id.* at 1118-19. The detectives immediately drove to Jackson County to question Mr. McGowan's mother about his whereabouts. *Id.* at 1244. She said she had "no idea where he was at." *Id.* at 1245. Mr. McGowan's girlfriend was there but refused to speak to the detectives. *Id.* at 1246. The detectives went to the lot where the motor home was parked; no one answered the RV door. *Id.* at 1247.

{¶ 44} Even before leaving the Jackson County motor home lot, however, Detective Duffer received a phone call from Mr. McGowan, who said "I want to turn myself in, I want to get it over with." *Id.* at 1124. When the detective asked him where he was, Mr. McGowan first responded, "that's not important," but then claimed to be in Columbus. *Id.* Detective Duffer told Mr. McGowan where to turn himself in there. *Id.* at 1124. Deducing that Mr. McGowan had gotten Detective Duffer's phone number from Mr. McGowan's mother, with whom they had left a business card, the detectives drove back "to speak to her." *Id.* at 1125. Once back at the mother's house, they noticed that McGowan's girlfriend had left: instinct impelled them to return to the motor home lot, Detective Duffer testified. *Id.* at 1126.

{¶ 45} The evidence is that Mr. McGowan was in Jackson County, not Columbus. When they arrived at the motor home lot, the detectives saw McGowan loading duffel bags into the motor home. *Id.* at 1251. The duffel bags contained brand new clothes including a camouflage hat and pants, three pairs of Kodiak heat socks, fishing line, a solar light, nylon

marine rope, thermal shirt, bandanas, bug spray, baby wipes, Cliff bars, eleven packages of smoked salmon, eight packages of tuna, and nine packages of beef jerky. *Id.* at 1130-36. Mr. McGowan was accompanied by his girlfriend. *Id.* at 1127. He was taken into custody. *Id.*

{¶ 46} Among other matters, Detective Duffer testified to messages involving Gabriel's Facebook account. Defense counsel inquired about a string of messages from the evening of February 19, purportedly from Mr. McGowan's number, sent after the time of Gabriel's last response from her phone. These included a message timed 6:04:52 p.m. that, "I love u sooo much gabby there's no one that knows me or cares for me the way you do. U just have to do right your baby's ain't a way to get money they need you," another message timed 6:06:38 pm reading "Just don't get high, I will drug test you tomorrow n see if you got some dope wit that money," and one from 7:55:50 p.m. saying "Just ignore me then." *Id.* at 1178; Defense Ex. O. The detective also testified to earlier correspondence, from January 1, 2017, apparently between Gabriel and a different man, in which text attributed to Gabriel said "U can hurt me" and offered sexual conduct. Tr. at 1198; Defense Ex. Q.

{¶ 47} The jury heard from other witnesses including two defense medical experts. Dr. Heath Jolliff, who practices emergency medicine and medical toxicology, observed that in this part of the country, heroin frequently is contaminated with Fentanyl. Tr. at 1565. He testified to his view that the amount of Fentanyl in Gabriel's system, 2.6 ng/ml, could have caused her death without regard to other potential causes. *Id.* at 1563, 1589-90. He also opined that it is impossible to determine whether the Buprenorphine would have limited the effects of the Fentanyl. *Id.* at 1583-84.

{¶ 48} Forensic pathologist Dr. William Cox opined that "Gabriel died as a result of an accidental overdose" of "Fentanyl, cocaine and marijuana." *Id.* at 1676. He further testified that, contrary to Dr. Gerston's findings, the injuries to Gabriel's throat, in the words of defense counsel, "could have happened after she died when the body was being manipulated." *Id.* at 1685, 1680-84. Gabriel had not suffered the sorts of brain damage or the petechial hemorrhages associated with strangulation, he averred. *Id.* at 1685-89. Dr. Cox also provided his opinion that Gabriel's body when recovered did not reflect the decomposition that would be evident for someone who had been dead for four or five days; her death had been more recent than that, he said. *Id.* at 1705.

{¶ 49} Other defense witnesses included private investigator and retired Columbus police lieutenant Robert Britt. In addition to offering criticisms of the investigation, he

testified that there had been "some people that were out on the west side" whose heads had been forcibly shaved in a manner that was "similar" to but "not necessarily" in the same circular pattern displayed by Gabriel's body; he concluded that the head shavings were "like a humiliation thing for others to see." *Id.* at 1481-82. He also believed that the holes on the front and on the sides of the recycling bin had been drilled "at different times" because they were of different sizes. *Id.* at 1483. His testimony also included the observation that people sometimes do dispose of the bodies of drug overdose victims. *Id.* at 1498.

{¶ 50} The defense called two lay witnesses who knew Gabriel and said they saw her at a drug house after she had been reported missing; she had said she could take care of herself, they testified, and did not need to check in with anyone. *See id.* at 1835-39 (R.P. testimony); 1623-27 (D.T. testimony). R.P. said that he did not use or sell drugs himself, but on cross-examination admitted to having sold Gabriel marijuana four years earlier. *Id.* at 1844, 1847, 1850. After the trial had begun, he had engaged in telephone conversations with both Mr. McGowan and Mr. McGowan's girlfriend. *Id.* at 1852. D.T., another friend of Mr. McGowan's, *id.* at 1621, was asked: "Do you remember if [Gabriel] was wearing a jacket?" He answered:

> A: I remember she was wearing a pink jacket.
>
> Q: What shade of pink was it?
> A: It was bright pink, hot pink.
>
> Q: And gray?
>
> A: Yeah.
>
> Q: So she was wearing a bright pink and gray top?
>
> A: Yeah. My baby's mother had the same jacket, that's why I remember it pretty well. Uh-huh.

*Id.* at 1640-41. (The solid black jacket that Gabriel was wearing when she left K.H.'s house in Mr. McGowan's car seems to have been a "Pink" logo jacket. *See id.* at 173, 176-77 ("completely black" with "love pink on the back of it"); State's Exs. 319, 324 (post mortem photographs with jacket).

{¶ 51} Defense witness W.S. testified that he had known J.B. to lie. Tr. at 1648. He also said that he had been told by M.C. to give J.B. $2,000 to hold for M.C., but that J.B. took off with the money not returned. *Id.* at 1652-54.

{¶ 52} The jury convicted Mr. McGowan of kidnapping, aggravated murder (purposely killing in the course of kidnapping), murder (causing death as a result of kidnapping or felonious assault), tampering with evidence, and gross abuse of a corpse; it acquitted Mr. McGowan of one count of murder as charged a different way. The trial court merged the kidnapping count and the other murder count into the aggravated murder conviction and sentenced Mr. McGowan to 25 years to life in prison on that (with concurrent prison sentences of 24 months on the tampering count and 11 months for the abuse of a corpse). May 11, 2018 Judgment Entry.

{¶ 53} On appeal, Mr. McGowan concedes that "[t]he record contains evidence which if believed would support the conclusion that [he] disposed of Gabby's body. That conclusion would justify the convictions [for] * * * tampering with evidence and gross abuse of a corpse." Principal Brief of Appellant at 18. He posits two assignments of error:

> [1.] The murder convictions (Counts 2 and 4) are contrary to the manifest weight of the evidence.
>
> [2.] The kidnapping conviction (Count 1) is contrary to the manifest weight of the evidence.

*Id.* at vi.

{¶ 54} "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 55} "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, [they] must also give great deference to the trier of fact's determination on the credibility of the witnesses." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 31, citing *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10. So " 'where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon

extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law.' " *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26, quoting *In re Miller,* 10th Dist. No. 97AP-853, 1998 Ohio App. LEXIS 246 (Jan. 27, 1998) at *12*, quoting *State v. Fluellen,* 10th Dist. No. 74AP-138, 1974 Ohio App. LEXIS 3688 (July 30, 1974), at *7. Because " 'we are guided by the presumption that the jury * * * "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony," ' " *Kurtz* at ¶ 18, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), "[m]ere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 56} In such a review, we are mindful that "[t]his court has consistently held that the weight to be given to inconsistencies in any witness' testimony is a determination within the province of the trier of fact, and such inconsistencies generally do not render a conviction against the manifest weight of the evidence." *Johnson*, 2005-Ohio-4389 at ¶ 26. It is generally "the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony." *See State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72.

{¶ 57} Our review of the entire record does not lead us to believe that this jury clearly lost its way and created a manifest miscarriage of justice.

{¶ 58} In arguing that "[t]he murder convictions * * * are contrary to the manifest weight of the evidence," Principal Brief of Appellant at 18 (bolding omitted), Mr. McGowan argues first that Dr. Gerston was wrong to attribute Gabriel's death to strangulation, *see id.* at 18-31. After all, he urges, "[t]wo defense experts * * * refuted" Dr. Gerston's opinion. *Id.* at 23 (bolding omitted). But weight of the evidence analysis does not hinge on the simple number of witnesses; "when the opinions of expert witnesses differ on methodology, analysis employed, or ultimate opinion, the trier of fact must determine which expert to believe." *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 44 (10th Dist.). While Mr. McGowan argues that Dr. Gerston's demotion and the coroner's suspension of his

autopsy work, under circumstances that were somewhat opaquely described but nevertheless raised during his testimony, "undermin[ed]" his credibility, Appellant's Principal Brief at 30, the jury heard these facts and still credited his views over those of the defense experts. Such conflicts indicate a functioning adversarial dynamic at trial, "not an extraordinary case [in which] the evidence presented weighs heavily in favor of the defendant." *See, e.g., State v. Loch*, 10th Dist. No. 02AP-1065, 2003-Ohio-4701, ¶ 41.

{¶ 59} The jury was at liberty, for example, to credit Dr. Gerston's rebuttal testimony that the coloring of abrasions on Gabriel's body did not establish that the wounds were suffered after death because immersion of the body in water would have created the observed effect. *See* Tr. at 1789. Dr. Gerston's rebuttal testimony also explained in further medical detail his view that the neck injury "could only have occurred while the victim was living, not after death." *Id.* at 1790-93. He testified that signs of brain injury following death in this context would not be observable "macroscopically" or "on the light microscope," but only under "an electron microscope which we don't use in this case." *Id.* at 1796. He explained his view that Gabriel was not under the influence of cocaine at the time of her death, *id.* at 1798-99 ("there was no parent cocaine present in her blood," and even cocaine metabolites were "extremely" low, amounting not to the 1,000 nanograms that might indicate recent use, but to only 25 ng). He elaborated on his opinion that the Fentanyl in Gabriel's body was not near lethal levels. *Id.* at 1796-97. And he further opined that Gabriel's body had been "preserved in cold water" of the creek, and that temperatures of "under 39 degrees Fa[h]renheit" can ward off decomposition "for quite a long time." *Id.* at 1800.

{¶ 60} And Dr. Gerston testified on rebuttal, too, that petechial hemorrhaging is not always present in strangulation cases, especially where blood circulation has been cut off through heavy pressure before death. *Id.* at 1793-94 ("it is something we don't always find because if the pressure is too great, you won't have any circulation to the area"). Indeed, Mr. McGowan's own briefing establishes that petechial hemorrhaging does not always accompany death by strangulation. *See* Appellant's Principal Brief at 29-30 (citing various cases reciting that petechiae are present "in eighty-five percent of manual strangulation cases"; that a strangulation victim will "generally" show signs "such as petechial hemorrhaging"; that such hemorrhaging is "typically" present and evidenced in a "very high percentage" of strangulation cases). Also, contrary to Mr. McGowan's apparent suggestion

in his Reply Brief at page 5, Dr. Gerston was consistent in maintaining that the Fentanyl in Gabriel's system was "not a lethal dose," and he did not say that people have overdosed at levels of .5 ng/ml. *See* Tr. at 1085-86 ("Not to my knowledge"; also noting that Gabriel "was on Fentanyl antagonist at the time").

{¶ 61} The jury was entitled to accept Dr. Gerston's medical opinions, including his testimony as to physical indications that she had been restrained and yanked around, and as to the sequencing of the injuries and death and the cause of death. It could have concluded, too, that contrary theories of death by accidental drug overdose did not fit so comfortably, for example, with Gabriel's head having been oddly shaved by someone shortly before her death. It also could have found that Mr. McGowan misrepresented his whereabouts to police in effort to elude arrest and flee, evidencing consciousness of guilt. " 'It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' " *State v. Williams*, 79 Ohio St.3d 1, 11 (1997), quoting *State v. Eaton*, 19 Ohio St.2d 145, 160 (1969), *vacated on other grounds*.

{¶ 62} And the jury was entitled to believe some or all of J.B.'s representations. "The jury is free to believe or disbelieve any or all of a witness's testimony." *State v. Hudson,* 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 18, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257, ¶ 21; *Kurtz*; *Johnson*; *Oteng*. Physical evidence collected from Mr. McGowan's garage, including the plastic shavings and the white conversion van with the blue plastic particle in it, was consistent with J.B.'s lengthy and largely coherent account. (And J.B. responded to police inquiry about the bleach bottles by recounting the garage cleaning.) Further still, K.H.'s testimony, consistent with electronic messaging, placed Gabriel with Mr. McGowan in his car on the afternoon of February 19, shortly before she stopped using her cell phone. And we see no reason that the jury could not have credited J.B.'s testimony about Mr. McGowan's harried affect and directions to him on February 20, along with J.B.'s testimony about the unusual bleaching of the garage just days later.

{¶ 63} As a more generalized attack on J.B.'s credibility, Mr. McGowan submits that "[o]n direct examination, [J.B.] testified that the last time he saw Gabby or had any communication with her was before he had ever worked for [Mr. McGowan]. * * * * But

on cross-examination, [J.B.] testified that he saw Gabby on Monday, February 20, and that that was the day [Mr. McGowan] told him to take the day off. * * * * It is crude but true: That statement is precisely what one would expect a lying, unsophisticated, heroin addict to make up near the end of his testimony to save the case for his sponsor." Principal Brief of Appellant at 32-33 (adding that "prosecutors surely must have been surprised as well, because otherwise they surely would have presented this testimony during direct examination"). Mr. McGowan doubles down on that characterization of the trial testimony in his Reply Brief, asking: "Is the Court, sitting as the thirteenth juror, to believe that until [J.B.] was being cross-examined at the murder trial of Andy McGowan, until after the prosecutor had already completed direct examination, [J.B.] had *forgotten* that after having not seen Gabby for several months, he saw Gabby in And[y] McGowan's car on the very day that Andy supposedly killed Gabby?!?" Reply Brief at 8 (emphasis in original).

{¶ 64} But the contention in Mr. McGowan's briefing that J.B. neglected on direct examination to testify to having glimpsed Gabriel in Mr. McGowan's car on February 20, and only added that point during cross-examination, is not correct. J.B.'s testimony on that score was consistent. On direct examination, he was asked whether, while he was living at the garage, he had ever seen Mr. McGowan with Gabriel. Tr. at 831-32. His response was that he had not, "up until the day that she come up missing." *Id.* at 832. And that day, he said, "I really didn't see her, but I seen the back of her head and I know it was her because I know her." *Id.* His testimony on cross was fully consistent with that account: "I saw a girl in the car and I know it was Gabby because I know what she looks like." *Id.* at 968 (adding that that was on "[t]he 20th"). *Compare* Tr. at 1151, 1162 (Det. Duffer testimony that J.B. had said he had not seen Gabriel that day; Detective "receive[d] information from [J.B.] * * * that on February 20th Andy was at the shop and Gabriel may have been there," but "he never saw her").

{¶ 65} Other purported inconsistencies in J.B.'s testimony—for example, that in addition to identifying the recycling bin and the battery in it as both having come from the garage, J.B. also had pointed to the first-responders' yellow rope and said, "I almost know what that is," *see id.* at 958, or that he had mentioned having seen blood in the garage, which was not observed by detectives and which would not have come from injuries to Gabriel—were again matters for jury consideration and in our view do not operate wholesale to invalidate every aspect of J.B.'s extensive testimony. *See, e.g., State v. West*,

10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 20 ("Even if D.R.'s testimony was contradictory, the jury was free to believe all, some, or none of her testimony").

{¶ 66} Mr. McGowan's briefing argues specifically that J.B.'s testimony about Mr. McGowan's "purported confession" is "too incredible" to be believed. Principal Brief of Appellant at 31-34; *see also* Reply Brief at 7-9. On direct examination, J.B. said that Mr. McGowan "told me he fucked up and killed Gabby," and on cross-examination, J.B. said his account remained consistent that (in counsel's phrasing of the question) Mr. McGowan had "told [him], man, she handed me custody papers for my baby and I killed her." Tr. at 923, 951. (While the state was not required to prove motive, we do note that K.H.'s testimony corroborated Gabriel's enthusiasm for seeing her daughter, and that certain of Gabriel's Facebook posts reflected efforts by Gabriel to expand her parental rights with regard to her other daughter (by another father). *See, e.g.,* Tr. at 1274-77 (testimony of Det. Meister); State's Exs. 622 (2016 communications), 623 (October 2016 communications); *see also* Tr. at 1290-91 and Defense Ex. T (regarding February 16, 2017 posting with message "Y'all better tell * * * Andrew I want supervised visits they can still live with you all BUT I WANNA SEE MY BABYS") ).

{¶ 67} Again, we find that determinations of credibility with regard to the testimony about Mr. McGowan confessing were well within the province of the jury. Mr. McGowan's briefing emphasizes that J.B. "contradicted himself as to when he heard this supposed confession," having testified first that Mr. McGowan had left the garage well before M.C. on the day the garage was scrubbed out with bleach, and then responding affirmatively that the confession came when "everyone had left" and he and Mr. McGowan "were alone." Principal Brief of Appellant at 32, citing Tr. at 851-52, 922-23. Although J.B.'s account that the confession came on "[t]he third day when [Mr. McGowan] come back," Tr. at 923, might be understood to refer to the date "three days later" on which Mr. McGowan was said to have returned to the garage to take the motor home, *see id.* at 853, both the state and defense counsel construe it to mean the date of the garage bleaching "about three days" after February 20, *see* Appellee's Brief at 35 and Tr. at 922. For purposes of (defense) argument, we adopt that assumption of the relevant time frame. But we do not find that the prosecutor's phrasing of the question in terms of everyone having left and J.B. and Mr. McGowan being "alone" necessarily discredits J.B.'s testimony of what he said Mr. McGowan confided when (at some point) they were by themselves.

{¶ 68} And that Mr. McGowan was "very secretive" does not necessarily make the statements J.B. attributes to him "too dubious to support a homicide conviction." *Compare* Principal Brief of Appellant at 34. The jury could have understood Mr. McGowan to be J.B.'s regular heroin supplier, boss, and quasi-landlord, with enormous control over J.B.'s largely isolated life. The jury could have concluded that Mr. McGowan thought of J.B. as an "unsophisticated * * * heroin addict," *see* Principal Brief of Appellant at 33, who lacked the agency to act on the confession or cut off his drug supply and livelihood. And it was the defense that offered testimony (in conflict with J.B.'s own account) that Mr. McGowan's business partner M.C. entrusted J.B. to hold a couple thousand dollars for him. *Compare* Tr. at 1652-54 (testimony of W.S.) *with id.* at 961 (cross-examination of J.B.). Our review of all of the evidence is that nothing precluded the jury from believing J.B.'s testimony that Mr. McGowan made the inculpatory statements.

{¶ 69} What Mr. McGowan argues the jury should have seen as a "more plausible explanation" that Gabriel was killed by a prostitution client, *see* Principal Brief of Appellant at 35-36 (citing January 1, 2017 "U can hurt me" message and Tr. at 1197-99); *see also* Tr. at 203 (K.H. testimony that at some point she was "nervous" that Gabriel "was back on the streets"), would require the jury to speculate as to how (especially if Mr. McGowan was accurate in telling K.H. that he had dropped Gabriel off after having picked her up on the 19th) he then came into possession of her body. Yet he "does not challenge in this appeal" what he concedes to be "evidence that [he] disposed of Gabby's body," Reply Brief at 1: he concedes that "[t]he non-medical forensic evidence implicates [him] * * * in disposing of Gabby's body." Principal Brief of Appellant at 6 (bolding omitted). The jury was not required to undertake the speculations that Mr. McGowan suggests. More to the point, Mr. McGowan was the last person to whom the state's evidence pointed as having been with Gabriel before she disappeared, and as noted above his efforts to elude police could be taken as evidence of consciousness of guilt.

{¶ 70} Here, as for example in *State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 44, "the jury was free to believe all, none or only part of the testimony of any of the witnesses, including those testifying on behalf of defendant. Such determinations are well within the province of the jury and we discern no miscarriage of justice in the decision to reject the defense theory."

{¶ 71} And J.B. did testify that Mr. McGowan confessed to the killing. *Compare, e.g., State v. Johnson*, 10th Dist. No. 05AP-12, 2006-Ohio-209, ¶ 33 (manifest weight of the evidence supported aggravated murder conviction, rejecting the defendant's argument that "there was no credible evidence to prove that he was the person who shot" the victim where a witness testified that the defendant stated "that he had to 'whack the dude' "); *State v. Weatherford*, 9th Dist. No. 22133, 2005-Ohio-4535, ¶ 26-27 (aggravated murder conviction supported by "totality of the evidence presented," including witness testimony that defendant had said that "[h]e struck her; she fell down. He ended up hitting her in the head with something else, killing her. * * * He said that before he left, he wiped the house down").

{¶ 72} We also note that on the evidence in this case, including Dr. Gerston's testimony as to the significant pressure applied to Gabriel's neck, "[p]urposeful killing may be inferred simply from the act of manual strangulation." *See State v. Rister*, 6th Dist. No. L-09-1191, 2012-Ohio-516, ¶ 12. And the jury could infer from K.H.'s testimony that Mr. McGowan had deceived Gabriel into believing that he was picking her up to see her child, or that shortly after he picked her up she was held against her will, with her phone discarded into an alley. Dr. Gerston's testimony as to the markings on Gabriel's body, including his analysis of the abrasions on Gabriel's back in a "pattern" created by "wrinkled cloth" that had been tightened or pulled before she died, support conclusions that her freedom was restrained while the injuries to her neck, sternocleidomastoid muscle, and upper middle back were inflicted. Tr. at 1027, 1033. The jury also had reason to conclude that Gabriel's hair was forcibly shaved at or before her death.

{¶ 73} After reviewing the record, and acting in our role as the "thirteenth juror," we find no cause to set aside the jury verdict that resulted in Mr. McGowan's conviction for aggravated murder, as merged with another count of murder alternately described. We see no reason to conclude that the jury lost its way and thereby created a manifest miscarriage of justice. We overrule Mr. McGowan's first assignment of error.

{¶ 74} Although Mr. McGowan does not appeal his convictions for tampering with evidence and for abuse of a corpse, he does appeal from the jury's finding on the kidnapping count (on which he was not sentenced because it merged into the aggravated murder conviction). Under his second assignment of error (presented, like his first, in terms of a manifest weight argument), he postulates that while there may be "arguably legally

sufficient evidence" for kidnapping on "the theory that Gabby died by strangulation * * * * [i]f, as argued [in the first assignment of error], the murder convictions should be reversed because the manifest weight of the evidence does not prove that [he] strangled Gabby, then so too should the kidnapping conviction [sic] be reversed."  Principal Brief of Appellant at 38.  His entire argument for the second assignment of error is thus contingent on our analysis of his first assignment.  We have overruled Mr. McGowan's first assignment of error and we incorporate that analysis with regard to his second assignment of error, which we overrule as well.

{¶ 75}  We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, P.J., and LUPER SCHUSTER, J., concur.

_____