[Cite as *State v. McLean*, 2020-Ohio-4893.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 19AP-626 |
| v. | : | (C.P.C. No. 18CR-2139) |
| Terrence R. McLean, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on October 13, 2020

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Daniel J. Stanley*, for appellee.

**On brief:** *Yavitch & Palmer Co., L.P.A.*, and *Jeffery A. Linn, II*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Terrence R. McLean, appeals from a judgment of the Franklin County Court of Common Pleas convicting him, pursuant to jury verdict, of one count of failure to comply with an order or signal of a police officer. Finding no merit to the appeal, we affirm.

{¶ 2} By indictment filed May 3, 2018, plaintiff-appellee, State of Ohio, charged appellant with one count of failure to comply with an order or signal of a police officer in violation of R.C. 2121.331 as a third-degree felony. Appellant entered a not guilty plea and the case proceeded to jury trial in July 2019.

{¶ 3}   According to the state's evidence, at 3:20 and 3:26 a.m. on April 26, 2018, the Columbus Police Department ("CPD") received 911 calls from LaVint Walton about a domestic dispute with an ex-boyfriend. Walton reported that the dispute occurred at his home on 1401 East 20th Avenue, that the man "smacked" him during the dispute, and that Walton maced him in retaliation. (Tr. at 121, State's Ex. A, Apr. 26, 2018 911 calls.). Walton further reported that the man displayed a gun during the dispute, told Walton he would return to Walton's home, and then drove away in a silver car in the direction of Cleveland Avenue.  Walton did not identify the man by name; however, he described the man as "a black guy * * * wearing a doo-rag * * * and [dressed in] all black."  *Id.* at 122, State's Ex. A.

{¶ 4}   Because the 911 caller alleged that the incident involved a firearm, a CPD helicopter unit was dispatched to locate the vehicle.  At approximately 3:33 a.m., several CPD officers, all in marked CPD police cruisers, responded to a report from the helicopter unit that a silver vehicle matching the description provided by the 911 caller had been located in the area of East 20th and Cleveland Avenues.  The responding officers included Lieutenant Robert Sagle,[1] Officers Benjamin Mackley and Brady Rich,[2] Officer William Phillips, and Officer Russell Redman.

{¶ 5}   When Lieutenant Sagle first observed the vehicle, he noted that its headlights were not illuminated.  He activated his cruiser's emergency lights and siren and pursued the vehicle. Although he was at times close to the vehicle, he could not see inside it. Likewise, the other officers pursued the vehicle with their cruisers' emergency lights and sirens activated.  During the pursuit, Lieutenant Sagle saw the vehicle nearly lose control when it hit a bump in the road while traveling at a high rate of speed.  He also observed the vehicle run a stop sign at a major intersection. When Lieutenant Sagle stopped at the stop sign, the vehicle was able to increase its distance from his cruiser.    Although he still could see the vehicle ahead of him, he de-activated his cruiser lights and siren and terminated his pursuit because it was too dangerous to continue, and he knew the helicopter unit would continue to track the vehicle.  Lieutenant Sagle eventually lost sight of the vehicle; he then assumed the role of managing the pursuit.

---

[1] At the time of the events at issue, Sagle was a lieutenant.  He was promoted to commander approximately one week prior to the commencement of trial.

[2]  Officers Mackley and Rich were in the same police cruiser.

{¶ 6} Through radio transmissions, Lieutenant Sagle kept track of the other officers involved in the pursuit. Those radio transmissions revealed that the vehicle traveled at high rates of speed, at times in excess of 80 m.p.h., failed to stop at several stop signs and red lights, and traveled left of center and in the wrong direction on one-way streets. Much of the area where the high-speed pursuit occurred was predominately residential, with speed limits of 35 m.p.h. or lower, and with cars parked on both sides of the street. (State's Ex. B1, B2, B3; cruiser video from Officers Phillips, Mackley, and Redman cruisers, respectively.)

{¶ 7} During the course of the pursuit, Officers Mackley and Rich came within 25 to 50 yards of the vehicle; however, they were unable to see inside it. Officer Phillips observed the vehicle as it passed by his cruiser driving in the opposite direction. He noted that it contained only one occupant–the black male driver–but he could not see well enough inside the vehicle to identify him. At some point, the vehicle drove slowly, between 15 to 20 m.p.h., toward Officer Redman in the opposite direction and passed "within inches" of the left side of his cruiser. (Tr. at 213.) As a result, Officer Redman's cruiser was "window to window" with the vehicle, and he was within "a few feet" of the driver. *Id.* at 215. Video from Officer Redman's cruiser corroborates this testimony. (State's Ex. B3.) Officer Redman flashed his cruiser spotlight at the vehicle and noted that the driver was a middle-aged black male. Due to the spotlight and the proximity of the cruiser to the vehicle, he was able to see the driver's face "pretty well." (Tr. at 217.) He did not see anyone else in the vehicle. Officer Redman testified that the streetlights, cruiser emergency lights and spotlight, and helicopter spotlight caused the area to be "very well lit." *Id.* at 215.

{¶ 8} Due to the perilous nature of the high-speed pursuit, Lieutenant Sagle ultimately terminated it. Although the high-speed aspect of the pursuit ended, the officers continued to follow the vehicle, with their lights and sirens de-activated, and the helicopter unit continued to track and report its location.

{¶ 9} A short time later, Officers Mackley and Rich observed and reported that the vehicle had just crashed into a building near Main Street in Bexley. The two officers approached the vehicle; it was unoccupied. Officer Rich remained with the vehicle while Officer Mackley searched the area for the driver. Several additional officers, including Officers Phillips and Redman, arrived and joined in the search. At approximately 3:43 a.m.,

the officers received a radio transmission from Officer Ward reporting that an individual, later identified as appellant, had been detained approximately one block from the crash site. Officer Rich left the crash site and joined the other officers in searching the area where appellant had been detained. That search yielded no weapons or additional suspects.

{¶ 10} Officer Redman recognized appellant as the same person he had seen pass closely by his cruiser during the police pursuit. When Officer Redman asked appellant why he did not stop his vehicle during the pursuit, appellant claimed he did not see the police behind him. However, appellant did not assert that he was not driving the vehicle, that his car had been stolen, or that he had been maced.

{¶ 11} Officer Redman's body camera video revealed that when asked if he knew "what red and blue lights mean," appellant responded "yes." (Tr. at 226; State's. Ex. D.) Redman then asked, "[w]hy didn't you know what they mean tonight?"; appellant replied "what [do] you mean?" *Id.* at 226, State's Ex. D. Officer Redman continued, "[w]hen all those cruisers - - when I came up to the front of you and turned my red and blue lights on and tried to stop you and you drove right past me?" *Id.* at 226-27, State's Ex. D. Appellant averred that he "didn't see no red and blue lights." *Id.* at 227, State's Ex. D. The body camera video does not depict an assertion by appellant that he had been maced and abducted by an unknown assailant who stole his car and then engaged in a high-speed car chase with CPD officers.

{¶ 12} Because appellant emitted a strong odor of alcohol, Officer Rich asked if he would submit to a field sobriety test; appellant declined, stating that he had been maced and his car had been stolen. Appellant was subsequently arrested and placed in the back of Officer Phillips' cruiser. Officer Phillips could not recall if appellant stated that his car had been stolen; however, he did recall that appellant claimed that he had been maced. Appellant's vehicle was subsequently impounded and searched. Several open liquor containers, as well as a few personal items, were found inside.

{¶ 13} Appellant testified that he and Walton were drinking and watching movies at Walton's home until the conversation "went south" and Walton asked him to leave. *Id.* at 250. Walton eventually called 911; appellant told him he would sit in his car (which was parked on the street in front of Walton's home) and wait for the police to arrive. Walton then maced appellant and closed the front door.

{¶ 14} Appellant walked to his car and soon realized he had left his glasses in Walton's house; he did not retrieve them. As he opened the driver's door, a man approached him from behind, maced him, and pushed him onto the floor of the front passenger seat. Because appellant had left the key in the car's ignition, the man was able to start the car and drive away. The man then led the police on a "high speed chase" during which appellant could hear police sirens. *Id.* at 254. Appellant was "a little nervous" and "fearful" and pleaded with the man to let him out of the car. *Id.* The man said nothing during the entire ordeal.

{¶ 15} The man eventually stopped the vehicle and got out. When appellant exited the vehicle, he did not know where he was and did not see anyone in the vicinity. Because it was dark and he was disoriented, he began walking toward a lighted area. He soon was approached by the police and ordered to get on the ground. He refused police requests to take a field sobriety test because he had not been driving the car. He told the police "50 times or more" that his car had been stolen. *Id.* at 255. The police impounded his car and had not returned it to him as of the date of trial.

{¶ 16} On cross-examination, appellant acknowledged that at no time during his three-hour encounter with the police that evening did he mention that an unknown assailant abducted and forced him inside his car, where he remained during the course of the police pursuit. He explained that he did not do so because he was "highly intoxicated" and did not understand what was happening. *Id.* at 263. He attributed his calm demeanor at the time of his arrest (which was captured by Officer Redman's body camera), to his belief that the police had caught the person who stole his car and that he was being detained only until the police were able to determine exactly what had happened. When asked why he waited until 3:52 a.m., nearly 10 minutes after he was detained, to tell the police that he had been maced, he responded, "I'm not sure." *Id.* at 264. When asked why he waited until 4:09 a.m. to tell the police that his car had been stolen, he again responded, "I'm not sure." *Id.* He explained that he did not know the precise times he mentioned those facts to the police but was certain that he stated them "repeatedly." *Id.* He acknowledged that it was not until police informed him that he was going to be charged with OVI and was asked to take a field sobriety test that he stated the car had been stolen and he was not driving it. He further testified that he did not provide the police with any details beyond the fact that his car had

been stolen because he "wasn't asked." *Id.* at 265. He admitted that he had never filed a police report alleging that he had been abducted and his car stolen. He further admitted that he could not identify the person who had maced and abducted him and stolen his car.

{¶ 17}  In addition to the witness testimony and documentary evidence presented at trial, the parties entered into three stipulations: (1)  authenticity of the 911 calls; (2) the vehicle involved in the police pursuit was registered to appellant; and (3) when interviewed by the police, Walton acknowledged that he never saw appellant holding a gun and that he believed the object he thought was a gun was actually a watch.

{¶ 18}  At the conclusion of trial, the jury returned a verdict finding appellant guilty as charged in the indictment. The trial court ordered and received a pre-sentence investigation report and thereafter held a sentencing hearing on August 20, 2019. At the conclusion of that hearing, the trial court sentenced appellant to an 18-month term of incarceration. The court memorialized appellant's conviction and sentence in an August 22, 2019 judgment entry.

{¶ 19} In a timely appeal, appellant advances the following two assignments of error:

> [I]. The trial court erred and thereby deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling appellant's Crim.R. 29 motion for judgment of acquittal, as the state failed to offer sufficient evidence to prove each and every element of the charge beyond a reasonable doubt.
>
> [II]. The trial court erred by finding appellant guilty and thereby deprived appellant of due process of law as guaranteed by provisions of the Ohio Constitution because the verdict of guilty was against the manifest weight of the evidence.

{¶ 20}  In his first assignment of error, appellant argues that the trial court erred by denying his Crim.R. 29 motion for acquittal.  A Crim.R. 29 motion for acquittal tests the sufficiency of the evidence. *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 12, citing *State v. Knipp*, 4th Dist. No. 06CA641, 2006-Ohio-4704, ¶ 11. In determining whether a trial court errs in denying a Crim.R. 29 motion, we employ the same standard

applicable to a sufficiency of the evidence review. *Id.*, citing *State v. Darrington*, 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15.

{¶ 21} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486 (1955). An appellate court examines the evidence in a light most favorable to the prosecution and concludes whether any rational trier of fact could have found that the prosecution proved the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. We will not disturb the verdict unless after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001). In determining whether a verdict is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against the accused would support the verdict. *Jenks* at paragraph two of the syllabus.

{¶ 22} Appellant was convicted of the third-degree felony offense of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B) and (C)(5)(a)(ii). R.C. 2921.331(B) provides that "[n]o person shall operate a motor vehicle so as to willfully elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." R.C. 2921.331(C)(5)(a)(ii) states that "[a] violation of [R.C. 2921.331(B)] is a felony of the third degree if the jury or judge as trier of fact finds * * * by proof beyond a reasonable doubt * * * [t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property."

{¶ 23} Though appellant argues that the trial erred in denying his Crim.R. 29 motion because the state failed to present sufficient evidence to prove the elements of the charged offense, his entire argument under this assignment of error relates to the credibility of his testimony versus that of the state's witnesses. However, " 'in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' " *State v. Scott*, 10th Dist. No. 18AP-964,

2019-Ohio-4175, ¶ 12, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4. Appellant does not raise any arguments related to the state's alleged failure to prove any specific element set forth in R.C. 2921.331(B) and (C)(5)(a)(ii). Rather, he argues that the testimony he presented denying that he was the driver of the vehicle was more credible than the evidence presented by the state identifying him as the driver. Thus, we address appellant's credibility arguments in our analysis of his second assignment of error, which argues that his conviction was against manifest weight of the evidence.

{¶ 24} In contrast to the sufficiency of the evidence, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins*, 78 Ohio St.3d at 387. Although there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶ 25} When presented with a manifest weight challenge, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). However, "in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). Accordingly, this court affords great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55.

{¶ 26} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 27} Appellant argues that his conviction was against the manifest weight of the evidence because Officer Redman's testimony identifying him as the driver of the vehicle was not credible. As noted above, Officer Redman testified that he saw appellant driving the vehicle as it slowly passed by him in the opposite direction. He further testified that he saw appellant's face "pretty well" as the vehicle passed "within inches" of his cruiser in an area well-lit by streetlights and his cruiser's emergency lights and spotlight. (Tr. at 213, 217). Appellant does not challenge this testimony, other than to generally dispute Officer Redman's identification of him as the driver. Rather, appellant argues that Officer Redman's testimony was not credible because, as he acknowledged on cross-examination, he did not inform any of the other officers at the time appellant was detained that he could positively identify appellant as the driver of the vehicle. However, the jury reasonably could have accepted Officer Redman's explanation that he did not think it was necessary to do so because he "believe[d] that it was understood based on the questions that I was asking that he was identified at that point." *Id.* at 234. We also note that Officer Redman's trial testimony regarding his questioning of appellant about whether he saw the "red and blue" police lights when he passed by him was consistent with the questioning captured on his body camera video.

{¶ 28} Appellant also challenges the credibility of Officer Redman's testimony on the basis of his admission that he did not inform the prosecutor's office of his identification of appellant until the morning he was scheduled to testify. Defense counsel conducted a thorough and extensive cross-examination of Officer Redman on this point, which sought to expose concerns about the veracity of his identification testimony. The jury was at liberty to ascribe less significance to the testimony regarding his failure to report his identification of appellant to the prosecution than to his testimony that he saw appellant's face "pretty well" as he passed closely by Officer's Redman's cruiser during the police pursuit. This is

especially true given that the jury was able to view Officer Redman's cruiser video and assess for itself the veracity of his testimony regarding his identification.   The jury was free to believe all, part or none of the testimony provided by Officer Redman.  *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 17, citing *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996).

{¶ 29}  Moreover, to the extent appellant argues that the jury lost its way in believing Officer Redman's identification testimony and disbelieving his own testimony contradicting Officer Redman, we are mindful that the presence of conflicting testimony does not render a conviction against the manifest weight of the evidence.  *State v. Johnson*, 10th Dist. No. 19AP-296, 2020-Ohio-4077, ¶ 20, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43.  Further, " a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the defendant's version."  *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 39, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.  As noted above, the jury may believe all, part or none of the testimony of each witness appearing before it, including that of Officer Redman and appellant.  *Johns* at ¶ 17. Mere disagreement over witness credibility is not a sufficient reason to reverse a judgment as against the manifest weight of the evidence.  *Id.*, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24

{¶ 30}  Appellant maintains that the jury should have believed his testimony that he was maced, abducted, and forced to the floor of the passenger side of his vehicle by an unknown assailant who then led the police on a high-speed chase through the streets of Columbus.  Appellant claims his testimony that he was highly intoxicated, disoriented from having been maced, and not wearing his glasses demonstrated that he was incapable of successfully maneuvering his vehicle during a high-speed car chase so as to both avoid hitting pedestrians and/or other vehicles and elude police officers trained in high-speed pursuit techniques.  The jury heard all of this testimony and was free to accept all, part, or none of it.  *Johns* at ¶ 17.  Moreover, we note that the jury also heard testimony from the state's witnesses that appellant never mentioned that he had been maced and abducted by an unknown assailant who forced him to the floor of his vehicle where he remained throughout the entire high-speed police chase, as well as appellant's cross-examination

testimony admitting the same. In addition, appellant did not effectively dispute the prosecution's queries about waiting ten minutes after he was arrested to even allege that he had been maced and another ten minutes to claim that his car had been stolen. Appellant's failure to relay these critical details to the police at the time he was detained permitted the jury to question the veracity of appellant's trial testimony.

{¶ 31} Finally, with respect to appellant's argument that the police failed to conduct a thorough investigation into his claim that he was not the driver, both by making a "snap judgment that they had their driver" and failing to check the vehicle for fingerprints other than his own, we note that Officer Redman's identification of appellant as the driver was sufficient to support the conviction. (Appellant's Brief at 14.) "The testimony of even 'one witness, if believed by the jury, is enough to support a conviction.' " *State v. Loomis*, 10th Dist. No. 17AP-843, 2019-Ohio-2576, ¶ 54, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. As explained above, the jury was in the best position to view appellant and the testifying police officers, including Officer Redman, and decide who was more credible. It appears as though the jury simply did not believe appellant's version of the events. "It is generally 'the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony.' " *State v. McGowan*, 10th Dist. No. 18AP-467, 2019-Ohio-5319, ¶ 56, quoting *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72. On this record, we simply cannot conclude that the jury did not fairly consider appellant's testimony or that it lost its way when it found the state's witnesses, including Officer Redman, more credible than appellant.

{¶ 32} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot find that the jury clearly lost its way when it discounted appellant's testimony in favor of the other evidence at trial, including Officer Redman's identification of appellant as the driver of the vehicle involved in the high-speed police pursuit. Accordingly, we find sufficient evidence to support appellant's conviction and that the conviction was not against the manifest weight of the evidence. We thus overrule appellant's first and second assignments of error.

{¶ 33} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and DORRIAN, JJ., concur.

————————